UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

COMPART'S BOAR STORE, INC.,
                                                    Case No. 12-CV-3090 (PJS/JJK)

                    Plaintiff,

v.                                                                      ORDER

UNITED STATES OF AMERICA,

                    Defendant.

Gary W. Koch and Matthew C. Berger, GISLASON & HUNTER LLP, for plaintiff.

Friedrich A.P. Siekert, UNITED STATES ATTORNEY'S OFFICE, for defendant.

Plaintiff Compart's Boar Store, Inc. ("CBS") brings various claims against the United States under the Federal Tort Claims Act ("FTCA").  28 U.S.C. §§ 1346(b), 2671 et seq.  CBS's claims arise out of disease testing performed by the government on swine that CBS intended to export to China.  The government reported that some of the tests performed on some of the swine were "inconclusive."  That report ultimately led not only to CBS losing the particular export deal for which the swine were being tested, but also to CBS being altogether banned from exporting swine to China.  CBS alleges that the government acted negligently both in conducting the tests and in reporting the results of the tests.

This matter is before the Court on the government's motion to dismiss or for summary judgment and on CBS's motion for partial summary judgment. The government asks that all of CBS's claims be dismissed for lack of jurisdiction or, alternatively, that judgment be entered in the government's favor. CBS seeks dismissal of some of the government's defenses—specifically, the defenses of lack of jurisdiction, contributory negligence, and comparative fault. For the reasons that follow, the Court grants the government's motion to dismiss for lack of jurisdiction and denies CBS's motion in its entirety.

## I. BACKGROUND

### A. CBS's Business

CBS raises breeding-stock swine—that is, swine that are sold to pork producers who use them to breed and produce other pigs for slaughter. C. Compart Dep. 123-24; J. Compart Dep. 9-10. At the time of the events giving rise to this action, CBS's breeding stock was primarily raised at facilities in three Minnesota towns: Princeton, Melrose, and Hamberg. J. Compart Dep. 22; C. Compart Dep. 82-86. CBS's Princeton herd was certified as specific-pathogen free in 1987, and no outside swine have entered that facility since then. C. Compart Dep. 81-82; 84-85. The certification required CBS to populate the Princeton facility with swine that were born using a specific surgical

procedure and then raised for several weeks in a sterile environment. C. Compart Dep. 84-85; J. Compart Dep. 34-37.

CBS used offspring from the Princeton herd to establish the Melrose and Hamberg herds, and no outside swine have entered either of those facilities since the herds were established. C. Compart Dep. 83-86. CBS conducts monthly tests at each facility to ensure that the herds remain disease-free. C. Compart Dep. 59-60, 64-65.

*B. PRRS and the Chinese Export Protocol*

Porcine respiratory reproductive syndrome ("PRRS") is a viral disease that can spread rapidly through swine herds. Def. Ex. 14 ¶ 1; C. Compart Dep. 35, 64, 260, 727; J. Compart Dep. 158-59. PRRS can cause pneumonia, lethargy, feeding problems, and spontaneous abortions. J. Compart Dep. 70.

The United States imposes testing and inspection requirements on swine and other livestock intended for export. *See* 9 C.F.R. § 91.3. The export of pigs to China is governed by the Quarantine and Health Requirements of the People's Republic of China for Swine Exported from the United States ("the Export Protocol"). Def. Ex. 115. Under the Export Protocol, only swine that come from facilities that have been free of PRRS for at least two years can be exported to China. *Id.* ¶ 5.6.

Swine selected for export to China must also undergo a battery of tests and quarantine procedures. Specifically, the Export Protocol dictates that all swine must

first test negative for PRRS using an immonufluorescent antibody ("IFA") test. *Id.* ¶ 5.7.8. After the initial IFA testing, the swine must be isolated in a quarantine facility approved by the United States Department of Agriculture ("USDA") for at least 30 days before export. *Id.* ¶ 6. During the quarantine, all swine must again test negative for PRRS using the IFA test, and a sample of ten percent of the pigs must also be tested using a virus-isolation ("VI") test. *Id.* (The VI test is described below.)

The Export Protocol requires that all testing be performed by the National Veterinary Services Laboratory ("NVSL") in Ames, Iowa. *Id.* NVSL is overseen by the Animal and Plant Health Inspection Service, which is part of USDA. *Id.* ¶¶ 1, 6; J. Compart Dep. 46-47.

### C. The Virus Isolation Test

As noted, the Export Protocol requires that ten percent of the quarantined pigs be tested for PRRS using the VI test. Unlike the IFA test, which reveals the presence of antibodies, the VI test reveals an active viral infection. Jenkins-Moore Dep. 63-64.

NVSL created a standard operating procedure for administering the VI test. Def. Exs. 14, 96; Jenkins-Moore Dep. 126-131, 152. Under this procedure, two different types of cells—known as "SAM" cells and "MARC" cells—are inoculated with tissue or serum samples. Def. Ex. 14 ¶¶ 1-2, 5. The resulting cultures are observed for "cytopathic effect" (that is, cell damage) over a number of days. Olson Dep. 41, 160-61.

(Cytopathic effect may indicate the presence of a virus.  Olson Dep. 41.)  At the end of this period, the cultures are frozen and thawed, and the process is repeated.  Def. Ex. 14 ¶ 5.  The cultures are placed onto fresh SAM and MARC cells and again observed for cytopathic effect.  *Id.*  If any cytopathic effect is observed, NVSL repeats the process again with yet more fresh SAM and MARC cells.  *Id.*  Finally, the cultures are stained and examined for fluorescence.  *Id.* ¶¶ 5-6.  The presence of fluorescence generally indicates the presence of the PRRS virus.  *Id.* ¶ 5; Olson Dep. 253-54.  This final step is similar to the IFA test described above.  Def. Ex. 14 ¶ 5; Olson Dep. 91-92; Lowe Dep. 195-96.

### D.  August 2011 Export

From 2009 to early 2011, China suspended all swine imports from the United States due to the H1N1 virus.  C. Compart Dep. 190-91, 253-54.  China began permitting swine imports from the United States again in March 2011.  J. Compart Dep. 112.  At the time, CBS was one of a handful of farms in the United States that were considered safe enough to export breeding stock to China.  C. Compart Dep. 170.

Shortly after China began permitting imports again, Ag World International Corporation ("Ag World"), a livestock export company, secured a contract to export breeding-stock pigs to China in August 2011.  C. Compart Dep. 317-18; Def. Exs. 502-

503.  In June 2011, Chinese buyers selected 367 pigs from CBS to be included in the Ag

World shipment.  C. Compart Dep. 334-35; Def. Ex. 509.

In late June 2011, Dr. Daniel Tomsche, a licensed and USDA-accredited

veterinarian hired by CBS, drew blood from the selected pigs and sent the samples to

NVSL for the pre-quarantine tests.  Tomsche Dep. 28; C. Compart Dep. 335, 340-41.  All

pigs tested negative for PRRS.  C. Compart Dep. 345-47.  CBS then placed the selected

pigs in a USDA-approved quarantine facility.  C. Compart Dep. 348-49; Frank Decl. ¶ 3.

As noted, the Export Protocol required that, before being exported to China, the

selected swine had to be quarantined for 30 days and then tested again for PRRS.

In July, Dr. Tomsche drew blood from the quarantined pigs to be used for the

IFA and VI tests.  Tomsche Dep. 29-30; C. Compart Dep. 385-86, 389.  NVSL conducted

the IFA tests and reported the results as negative.  Def. Exs. 511-513.  NVSL also

conducted the VI tests and observed no cytopathic effect.  Swenson Decl. ¶ 15(d), (e), (f),

(h).

As noted, at the very end of the VI-testing process—after the cells are examined

for cytopathic effect—the cells are stained and examined for fluorescence.  On August 9,

2011, lab technician Annette Olson observed fluorescence in distinct cells on ten of the

stained MARC slides.  Olson Dep. 11, 261-63; Def. Ex. 31; Swenson Decl. ¶ 15(i).  The

fluorescence was unusual.  Normally, a positive slide will "light up with almost a bright

apple green fluorescence," whereas a negative slide will look "almost black." Olson Dep. 44. These particular MARC slides did not look like either a positive or a negative slide; the slides had some fluorescence, but the fluorescence was not as bright as Olson typically observed on positive slides. Olson Dep. 44-46.

Olson showed the slides to other people in the lab, including Dr. Sabrina Swenson (her supervisor) and Dr. Beverly Schmitt (Dr. Swenson's supervisor). Olson Dep. 46-48. Olson did not feel comfortable characterizing the results as either positive or negative. Olson Dep. 73-74. Dr. Swenson contacted outside experts, who opined that if PRRS was present there should be cytopathic effect. Def. Ex. 22. (Again, no cytopathic effect had been observed.) Similarly, Olson contacted her former supervisor, who opined that he would expect there to be cytopathic effect if PRRS was present. Def. Ex. 31. Meanwhile, NVSL conducted additional testing on the CBS samples. Swenson Decl. ¶ 15(i)-(*l*). The same unexplained fluorescence was observed in some of the samples, but again no cytopathic effect was observed. Swenson Decl. ¶ 15(i)-(*l*).

CBS first learned of the problem with the VI test on August 10. C. Compart Dep. 421, 429. In an effort to address the problem, CBS submitted additional samples from the ten suspect animals to the University of Minnesota for testing. C. Compart Dep. 431-32, 468. All samples tested negative for PRRS. Def. Ex. 47.

On August 12, NVSL issued a final report on the CBS swine stating that no evidence of PRRS was observed in any of the samples, with the exception of ten samples whose results were "inconclusive." Def. Ex. 15 at 8. The report explained that limited areas of staining were observed on the MARC cells, that no staining was observed on the SAM cells, that no cytopathic effect was observed in any of the cells, and that all other tests were negative for PRRS. Def. Ex. 15 at 8; C. Compart Dep. 466 (CBS received the official NVSL report on August 12).

At that point, CBS knew that it would not be able to participate in the August 2011 shipment of swine to China. C. Compart Dep. 466-67. CBS attempted to get its swine approved for inclusion in a September shipment to China, but on August 17, China suspended all imports from CBS. C. Compart Dep. 480-82; Def. Ex. 195; Williams Dep. 120-23. Later re-testing of the original samples came up negative, as did testing of new samples submitted to NVSL. Def. Exs. 19, 20, 21, 36; Williams Dep. 150.

## II. ANALYSIS

### A. Standard of Review[1]

The United States moves under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss CBS's complaint for lack of subject-matter jurisdiction. In ruling on such a motion,

> "the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)).

---

[1]The government does not identify a standard of review for its motion. CBS recites only the standard applicable to summary-judgment motions. Because the government is moving to dismiss for lack of jurisdiction, the correct standard is that recited above. The Court notes, however, that the standard of review makes no difference, as the government would be entitled to judgment even under the standard applicable to summary-judgment motions.

*B. Jurisdiction*

The United States enjoys sovereign immunity and therefore may not be sued

unless it consents. *Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 671 (8th

Cir. 2008). Under the FTCA, the United States has consented to being sued for damages

> for injury or loss of property, or personal injury or death
> caused by the negligent or wrongful act or omission of any
> employee of the Government while acting within the scope
> of his office or employment, under circumstances where the
> United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the
> act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA includes a number of exceptions to this waiver of

immunity. "If one of the exceptions applies, the bar of sovereign immunity remains."

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 485 (2006).

CBS brings five somewhat overlapping claims against the government:

(1) negligence; (2) veterinary medical malpractice; (3) negligent inspection; (4) negligent

performance of undertaking to render services; and (5) negligent performance of

undertaking of services to others. Although couched as five separate counts, CBS's

claims boil down to two allegedly negligent acts: (1) negligent *reporting*—that is, a claim

that the government acted negligently when it reported the results of the VI test as

inconclusive; and (2) negligent *testing*—that is, a claim that the government acted

negligently when it conducted the VI test.[2]

The government argues that the Court lacks jurisdiction over CBS's claims

because they fall within various exceptions to the FTCA's waiver of sovereign

immunity. The Court need address only one of those exceptions: the discretionary-

function exception.

1. Negligent Reporting

The government argues that the discretionary-function exception to the waiver of

sovereign immunity bars CBS's claim that the government acted negligently in

reporting the results of the VI test as inconclusive. The Court agrees.

The discretionary-function exception deprives courts of jurisdiction over any

claim "based upon the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of a federal agency or an employee of the

Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The purpose of the discretionary-function exception is to "prevent judicial 'second-

guessing' of legislative and administrative decisions grounded in social, economic, and

---

[2]In its briefing, CBS contends that NVSL's VI-testing procedures do not conform
to accepted scientific standards. At oral argument, however, CBS clarified that it is not
basing any claim on this allegation, but instead bases its negligent-reporting claim on
NVSL's alleged failure to follow its own standard operating procedure.

political policy through the medium of an action in tort . . . ." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (citation and quotations omitted).

Courts undertake a two-part inquiry to determine whether the discretionary-function exception applies. First, a court asks whether the challenged conduct was discretionary—that is, whether it involved an element of judgment or choice. *Id.* at 322. The exception does not apply if a federal employee is sued for violating a statute, regulation, or mandatory policy that prescribes a specific course of conduct that the employee must follow. *Id.* In such a case, the employee is required to obey the statute, regulation, or policy; she does not have discretion to do otherwise. *Id.*

If no such statute, regulation, or mandatory policy exists, the challenged conduct is deemed to be discretionary, and the court moves on to the next step of the inquiry, which asks whether the challenged conduct involved the kind of policy judgment that the discretionary-function exception is intended to protect. *Id.* at 323-25. When government policy provides discretion, an employee exercising such discretion is presumed to be exercising protected policy judgment. *Id.* at 324; *Metter v. United States*, 785 F.3d 1227, 1231 (8th Cir. 2015). The plaintiff bears the burden of rebutting this presumption. *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004). The employee's subjective intent is irrelevant; the question is whether the employee's actions "are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

CBS argues that the conduct that it challenges—NVSL's reporting the results of the VI test as inconclusive—was not discretionary because NVSL was required by a mandatory policy to report the results as negative. CBS points to NVSL's standard operating procedure for the VI test, which provides that "[i]f no [cytopathic effect] is observed [after the second culture], the cultures are discarded and the specimen is reported as negative for PRRS virus isolation." Def. Ex. 14 ¶ 5. Because NVSL observed no cytopathic effect, CBS argues, the standard operating procedure required NVSL to report a negative result.[3]

CBS's argument misconstrues the standard operating procedure. In particular, CBS overlooks the fact that later in the same standard operating procedure appears a section entitled "Special Notes," which sets forth additional steps for qualifying pigs for export to China. Def. Ex. 14 ¶ 6. This section requires that, after the SAM and MARC cells are cultured and examined for cytopathic effect, "[a]t least one coverslip from one inoculated Leighton tube per sample and one inoculated chambered slide per sample is stained by IFA as described above and examined for specific fluorescence. Results are

_____

[3]Notably, CBS's own expert, Dr. James Lowe, does not agree that NVSL should have reported the test as negative solely on the basis of the lack of cytopathic effect, notwithstanding the presence of the staining. Lowe Dep. 251 (testifying that a negative report under such circumstances would be "dishonest"). Rather, Dr. Lowe testified that NVSL should not have reported *any* results but instead should have kept testing. Lowe Dep. 251-53. Dr. Lowe further testified that staining was required under the protocol regardless of the presence of cytopathic effect. Lowe Dep. 257-58.

entered into the laboratory information management system (LIMS) and reported as requested." Def. Ex. 14 ¶ 6.  Unlike the general procedure cited by CBS, the specific procedure that applies to pigs intended for export to China requires both staining and reporting of the results of the staining regardless of whether cytopathic effect is observed.  CBS thus cannot show that NVSL failed to follow its standard operating procedure.[4]

CBS has another problem:  Even if CBS could show that NVSL failed to follow its standard operating procedure, CBS cannot show that the standard operating procedure is *mandatory*.  The only evidence in the record about whether the standard operating procedure is mandatory suggests that, in fact, NVSL personnel have discretion to deviate from it:

> Q.      So I am assuming that, for each test, there's a
>           standard operating procedure that lab personnel are
>           to follow.
>
> A.      Yes.
>
> Q.      What is the significance of having a standard
>           operating procedure?  What's the scientific reason to
>           have one?

---

[4]Similarly, to the extent that CBS contends that NVSL had to report the samples as negative for PRRS because the staining did not resemble the bright staining typically observed on the positive control slides, CBS has not identified a policy that requires a negative report under those circumstances.  Likewise, to the extent that CBS contends that NVSL was required to perform additional tests or take other action to validate the test results, CBS has not identified a policy requiring such action.

-14-

A.    So you can perform the test the same way so you can, hopefully, replicate the results if you need to.  So every sample is treated the same way.

Q.    It is important to follow the SOP, right?

A.    Yes.

Q.    It is kind of the Bible of what you guys do, isn't it?

A.    The SOP is, essentially, a recipe that we follow.

*Q.    You don't deviate from it?*

*A.    If we deviate, we mention it on our paperwork.*

Jenkins-Moore Dep. 65 (emphasis added).  Moreover, even if the standard operating procedure were ambiguous regarding the extent to which it was mandatory, it would not supply the clear, mandatory directive necessary to deprive government employees of discretion.  *See C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799-801 (8th Cir. 1993) (policy that was unclear and insufficiently specific did not deprive government of discretion).

In short, CBS has failed to establish either that NVSL violated its standard operating procedure or that NVSL's standard operating procedure was mandatory. Clearly, then, the decision by NVSL personnel to report the results of the VI test as inconclusive was discretionary.

The next question is whether the decision to report the results of the VI test as inconclusive involved the kind of policy judgment that the discretionary-function exception is meant to protect. *Gaubert*, 499 U.S. at 322-23. The Court has little trouble concluding that it did. NVSL was testing the pigs for export to China, the world's most populous country. The unusual results of the VI test—results that were neither clearly positive nor clearly negative—presented the lab with a dilemma. Incorrectly reporting the results as negative could have undermined China's confidence in NVSL testing—and that, in turn, could have had broad implications for trade with China and harsh consequences for swine breeders in the United States (including CBS). It bears emphasizing that at the time that NVSL was trying to decide how to report the results of the VI test, China had only recently lifted its ban on swine imports from the United States. At the same time, incorrectly reporting the results as positive could have had harsh consequences for CBS. Determining what to do in this sensitive situation plainly involved a high level of discretionary judgment and considerations of public policy. *See Berkovitz v. United States*, 486 U.S. 531, 537 (1988) ("The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.").

CBS contends that NVSL did not actually exercise any policy judgment when it decided how to report the results of the VI test. Instead, CBS argues, NVSL's internal

and external communications reflect that lab personnel believed that they must have made a mistake of some kind in conducting the test. CBS further contends that there are factual disputes concerning who decided to report the results as inconclusive and why that person made that decision.

The Court may resolve factual disputes in deciding whether it has jurisdiction to hear a claim. *Osborn*, 918 F.2d at 730. The Court need not do so, however, because the factual disputes identified by CBS relate to the subjective intent of NVSL personnel, and the subjective intent of NVSL personnel is irrelevant for purposes of determining the applicability of the discretionary-function exception. *See Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the employee's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."); *Herden v. United States*, 726 F.3d 1042, 1047 (8th Cir. 2013) (en banc) ("the exception applies whether or not a defendant in fact engaged in conscious policy-balancing") (citation, brackets, and quotations omitted).

At bottom, the question for the Court is simply whether NVSL's decision to report the results of the VI test as inconclusive was *susceptible* to a policy analysis. *Gaubert*, 499 U.S. at 325. Because the answer to that question is clearly "yes," CBS's

negligent-reporting claim falls within the discretionary-function exception and must be dismissed for lack of jurisdiction.

## 2.  Negligent Testing

CBS next alleges that NVSL negligently performed the VI test.  CBS cannot identify what NVSL did wrong, but broadly contends that, given the overwhelming evidence that its pigs were not infected with PRRS, somebody at NVSL must have done *something* wrong to cause the inconclusive test results.  In essence, then, CBS invokes the doctrine of res ipsa loquitur.

This claim fails for two reasons.  First, by invoking the doctrine of res ipsa loquitur, CBS is conceding that it cannot identify a specific negligent act or omission committed by a specific employee of NVSL.  *See Brewster v. United States*, 542 N.W.2d 524, 528-29 (Iowa 1996).[5]  But if CBS cannot identify a specific negligent act or omission committed by a specific employee of NVSL, CBS necessarily cannot show that the act or omission that caused the inconclusive results violated a mandatory policy or did not "involve an element of judgment or choice."  *Gaubert*, 499 U.S. at 322 (brackets, quotations, and citation omitted).  Likewise, CBS cannot rebut the presumption that the allegedly negligent act or omission involved the kind of policy judgment that the

---

[5]The Court applies Iowa law because, under the FTCA, the government's liability is determined "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

discretionary-function exception was meant to protect.  *Metter*, 785 F.3d at 1231.  As a result, CBS cannot establish that its negligent-testing claim falls outside of the discretionary-function exception, and the Court therefore lacks jurisdiction over the claim.[6]

Second, even if the Court had jurisdiction over this claim, the Court would dismiss the claim on the merits.  To succeed on a negligence claim under the doctrine of res ipsa loquitur, "the occurrence [must be] such as in the ordinary course of things would not happen if reasonable care had been used."  *Brewster*, 542 N.W.2d at 529 (citation and quotations omitted).  There is no dispute that the standard of care for laboratory testing is not within the common experience of laypeople.  Accordingly, expert testimony is necessary to establish that the staining observed on the MARC slides would not have occurred in the absence of negligence.  *Cf. id.* at 530 (expert testimony may be used to establish that the accident would not have happened in the absence of negligence).

---

[6]The Eighth Circuit has not conclusively decided whether, in FTCA cases, the plaintiff bears the burden to show that the discretionary-function exception does *not* apply.  *Hart v. United States*, 630 F.3d 1085, 1089 n.3 (8th Cir. 2011).  Nevertheless, the Eighth Circuit has strongly hinted that the burden rests with the plaintiff, and, in any event, it is clear that the plaintiff bears the burden to rebut the presumption that a discretionary decision did not involve policy considerations.  *Id.*; *Demery*, 357 F.3d at 833.  Absent more guidance from the Eighth Circuit, the Court follows the general rule that the proponent of federal jurisdiction bears the burden to show that such jurisdiction exists.  *Jones v. United States*, 727 F.3d 844, 846 (8th Cir. 2013).

CBS has no such expert testimony. CBS's expert, Dr. Lowe, never testified that abnormal test results would not ordinarily occur unless someone was negligent. To the contrary, Dr. Lowe testified that abnormal results are everyday occurrences in laboratory testing[7] and are "nobody's fault." Lowe Dep. 214. Because CBS has no evidence that the VI-test results could not have occurred in the absence of negligence, CBS cannot proceed on its res ipsa loquitur theory. And because CBS cannot identify any specific negligent act or omission that produced the inconclusive VI-test results, CBS cannot proceed on a traditional negligence theory. In short, CBS cannot prove that NVSL acted negligently in conducting the VI test.

For these reasons, the Court would grant the government's motion for summary judgment on the merits of the negligent-testing claim, if the Court had jurisdiction over that claim. But because the Court does not have jurisdiction over that claim, the Court will dismiss the claim without prejudice. *Hart v. United States*, 630 F.3d 1085, 1091 (8th Cir. 2011).

---

[7]*See* Lowe Dep. 30 ("Even if the test were performed adequately, all tests have varying degrees of accuracy."); Lowe Dep. 214 ("It's a biological system. Things go wrong all the time. It's nobody's fault."); Lowe Dep. 233 ("It's not called negative. It's called no-test and you start over. It happens every day."); Lowe Dep. 243 ("The test didn't perform the way it was supposed to happen, which happens all the time.").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.     Defendant's motion to dismiss or for summary judgment [ECF No. 47] is GRANTED, and this action is DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

2.     Plaintiff's motion for partial summary judgment [ECF No. 84] is DENIED insofar as it seeks a ruling that the Court has jurisdiction over this case and DENIED AS MOOT insofar as it seeks a ruling on the merits of any of the government's defenses.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 7, 2015          s/Patrick J. Schiltz
                                    Patrick J. Schiltz
                                    United States District Judge